## WASSON v. HAWKINS.

(Circuit Court, D. Indiana. January 5, 1894.)

No. 8,922.

BANKS—INSOLVENCY—DEPOSITS FRAUDULENTLY RECEIVED.

Where money and checks are unsuspectingly deposited in a bank, which is known by its managing officer to be hopelessly insolvent, a few minutes before closing hour on the last day on which it does business, and the checks are subsequently collected by the bank's clerk, the whole of the deposit is charged with a trust, and an equal amount may be recovered from the receiver, who retains the specific money among the general mass of the bank's funds.

In Equity. Suit by Hiram P. Wasson against Edward Hawkins, receiver of the Indianapolis National Bank, to recover the amount of certain deposits. On demurrer to the bill. Overruled.

Duncan & Smith, for complainant.

Frank B. Burke and John W. Kern, for defendant.

BAKER, District Judge. The questions for decision in this case arise upon a demurrer to the bill of complaint. The bill shows that for many years prior to the 24th day of July, 1893, complainant had been engaged in business in the city of Indianapolis; that on that day, and for many years prior thereto, he had been a depositor in the Indianapolis National Bank; that Theodore P. Haughey then was, and from the organization of the bank had been, its president; that for many years, as such president, he had been intrusted by the directors of said bank with its absolute control and management; that its cashier was never consulted, either by the president or the board of directors, in any of the matters of management, and his duties, as prescribed by the directors and the president, were simply clerical; that on said 24th day of July, 1893, said bank was utterly and hopelessly insolvent, and unable to continue its business longer for a single day, which was fully known to its said president, who was on said day present in said bank watching its operations; that complainant was ignorant of the fact that said bank was insolvent or in danger of insolvency, and, had he known that it was insolvent or in danger of insolvency, he would not have deposited therein any sum of money whatever; that said bank and its president, who had sole and exclusive management of its affairs, well knew that complainant did not know of the insolvency of said bank, and well knew that he believed it was solvent, and able to meet on demand the claims of its depositors in the usual course of business, and further well knew that, if complainant had knowledge of the true condition of said bank, he would not deposit any money therein; that said bank and its president well knew that complainant, relying upon its solvency, was regularly, from day to day, making large deposits of money in said bank; that said bank and its president, well knowing the premises aforesaid, fraudulently concealed from the complainant the insolvency of said bank, and did not in any way warn him of his danger in depositing money therein;

that on said 24th day of July, 1893, the complainant, within less than five minutes of the hour at which said bank closed its business for the day, viz. 3 o'clock P. M., deposited in said bank, in money, the sum of $1,642.50, and the further sum of $504.14 in the checks of various persons, drawn upon other banks in the city of Indianapolis; that all of said checks were received as cash, and credited to complainant's account on his pass book and upon the books of the bank as so much cash; that said bank closed its doors and business for the 24th day of July, 1893, at the hour of 3 o'clock P. M., and never thereafter opened them for business, and never thereafter transacted any business whatever; that no part of said moneys were paid out by said bank prior to its suspension, but the same remained in said bank until the appointment of the defendant as receiver thereof; that the checks so deposited were on the morning of July 25, 1893, collected by a clerk then in the employ of said bank, and the proceeds held in the bank until the appointment of the defendant as receiver, when such proceeds were delivered into his hands as such receiver; that said receiver received and retained possession of the moneys so deposited, and of the moneys arising from the collection of the checks so deposited; that, before bringing suit, complainant demanded of the defendant, as receiver, the moneys and the proceeds of the checks so deposited, which demand was by the defendant refused.

The bank was insolvent, and was known by its president, who had sole management of it, to be insolvent. The knowledge of the president was the knowledge of the bank. Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428; Bank v. Walker, 130 U. S. 267, 9 Sup. Ct. 519. It fraudulently concealed its insolvency from the complainant, who was ignorant of it, and, believing it to be solvent, he deposited, in the bank, bank notes and checks to the amount of $2,146.64 within five minutes of its final collapse. The reception of the money and checks, under such circumstances, was a fraud upon the plaintiff, and entitled him to rescind the transaction, and recover back his deposit from the bank. The keeping of the bank open, and the conducting of its business in the usual manner, constituted a representation to its customers of the solvency of the bank, upon which they had the right to rely; and, if the bank was known to be insolvent by the officers who were charged with its management, the concealment of that fact from a person about to make a deposit would constitute a fraud upon him. The title acquired by the bank to the money and checks deposited under such circumstances would be voidable at the election of the depositor, who could bring suit to recover his deposit without any previous demand. The bank would become a trustee ex maleficio, and would hold the deposit for the use of the depositor, and subject to his right of reclamation. Railway Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537; City of Somerville v. Beal, 49 Fed. 790; Peck v. Bank, 43 Fed. 357. In the case of Cragie v. Hadley, supra, it was held that the acceptance of a deposit by a bank hopelessly insolvent constituted such a fraud as entitled the depositor to his drafts or their proceeds.

In Anonymous Case, 67 N. Y. 598, the court say: "This is not like the case of a trader who has become embarrassed and insolvent, and yet has reasonable hopes that by continuing in business he may retrieve his fortunes. In such a case he may buy goods on credit, making no false representations, without the necessary imputation of dishonesty. Nichols v. Pinner, 18 N. Y. 295; Brown v. Montgomery, 20 N. Y. 287; Johnson v. Monell, 41* N. Y. 655; Chaffee v. Fort, 2 Lans. 81. But it is believed that no case can be found in the books holding that a trader who was hopelessly insolvent, knew that he could not pay his debts, and that he must fail in business, and thus disappoint his creditors, could honestly take advantage of a credit induced by his apparent prosperity, and thus obtain property which he had every reason to believe he could never pay for." And it was decided that "in the case of bankers, where greater confidence is asked and reposed, and where dishonest dealings may cause widespread disaster, a more rigid responsibility for good faith and honest dealing will be enforced than in the case of merchants and other traders;" and that "a banker who is, to his own knowledge, hopelessly insolvent, cannot honestly continue his business, and receive the money of his customers; and, although having no actual intent to cheat and defraud a particular customer, he will be held to have intended the inevitable consequences of his act. i. e. to cheat and defraud all persons whose money he receives, and whom he fails to pay before he is compelled to stop business."

It is insisted by counsel for the receiver that, though the money and checks were obtained by fraud, the title to them vested in the bank; and that the only relation subsisting between the plaintiff and the bank was that of creditor and debtor; and that he cannot reclaim the money and checks, because money has no earmark, and cannot be identified; and that the plaintiff has no lien on the fund in the receiver's hands entitling him to priority or preference over the other creditors of the bank. It was said by Lord King in Deg v. Deg, 2 P. Wms. 414, that "money had no earmark, insomuch that if a receiver of rents should lay out all the money in the purchase of land, or if an executor should realize all his testator's estate, and afterwards die insolvent, yet a court of equity could not charge or follow the land." See, also, Cox v. Bateman, 2 Ves. Sr. 19. And bank notes and negotiable bills have been represented as possessing the same quality. But the notion that money, because it had no earmark, could not be followed into or charged upon land in the hands of the trustee or his executor, arose from some misconception, and could not be supported. In Miller v. Race, 1 Burrows, *452, Lord Mansfield exposed this misconception, and pointed out the true reason why money could only be pursued under particular circumstances. He observed:

"It has been quaintly said that the reason why money cannot be followed is because it has no earmark; but this is not true. The true reason is upon the currency of it; it cannot be recovered after it has passed in currency. So, in case of money stolen, the true owner cannot recover it after it has been paid away fairly and honestly upon a valuable and bona fide consideration: but, before money has passed in currency, an action may be brought for the money itself. Apply this to the case of a bank note. An action may lie against

the finder, it is true, and it is not at all denied, but not after it has been paid away in currency; and this point has been determined, even in the infancy of bank notes."

Lord Ellenborough, in Taylor v. Plumer, 3 Maule & S. 562, 575, observed:

"The dictum that money has no earmark must be understood as predicated only on an undivided and undistinguishable mass of current money; but money kept in a bag, or otherwise kept apart from other money, guineas, or other coin marked (if the fact were so) for the purpose of being distinguished, are so far earmarked as to fall within the rule which applies to every other description of personal property while it remains in the hands of the factor or his general legal representative."

The true distinction, therefore, between money, bank notes, or negotiable bills, and other chattels, would seem to be that the former, for the protection of commerce, cannot be followed into the hands of a bona fide holder to whom they have passed in due course of business, while other chattels affected by a trust may, in general, be pursued and reclaimed. The ancient notion that money could not be followed, even as between trustee and cestui que trust, because money had no earmark, has given way to a more just and enlightened doctrine. Money, bank notes, and negotiable bills may be followed by the rightful owner, where they have not been circulated or negotiated, or if the person to whom they have passed has express notice of the trust. Miller v. Race, 1 Burrows, *452; 1 Smith, Lead. Cas. (5th Amer. Ed.) 597, (*250;) Taylor v. Plumer, 3 Maule & S. 562, 575; King v. Egginton, 1 Term R. 370; Ryall v. Rolle, 1 Atk. 172; Pennell v. Deffell, 4 De Gex, M. & G. 372; In re Hallett's Estate, 36 Eng. R. 779, 13 Ch. Div. 696; National Bank v. Insurance Co., 104 U. S. 54.

The only difference between money, and notes and bills, is that money is not earmarked, and therefore cannot be traced except under particular circumstances, while bills and notes, having a number and date, may generally be identified with less difficulty. It is conceded that, if plaintiff could identify the particular coins and bank notes which he had deposited, he would have the right to withdraw them from the mass of coins and bank notes which passed into the hands of the receiver; but it is insisted that inasmuch as the money deposited by him has, like water, flowed into the common mass, and so become incapable of identification, the right to pursue and reclaim it is lost, although it is admitted that the very coins and bank notes deposited by him constitute a part of the common mass. It is charged in the bill, and admitted by the demurrer, that the identical coins and bank notes deposited by the plaintiff remained in the bank when it stopped business, and came into the hands of the receiver, who now has them in his possession as a part of the general mass of coins and notes held by him as such receiver. In such a case the identification is sufficient to entitle the depositor to follow and reclaim the deposit made by him. Although the identical coins and bank notes cannot be ascertained, yet, as it is admitted that so much in coins and bank notes belonging to the plaintiff is in the common mass, he is entitled, in equity and good conscience, to take so much out. If he does not withdraw from the common

mass the very coins and bank notes deposited by himself, no injustice is done, for he leaves an equitable amount of his own in place of every coin or bank note deposited by another. Pennell v. Deffell, 4 De Gex, M. & G. 372; In re Hallett's Estate, 36 Eng. R. 779, 13 Ch. Div. 696; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537; National Bank v. Insurance Co., 104 U. S. 54; Frelinghuysen v. Nugent, 36 Fed. 229; Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354; Bank v. Dowd, 38 Fed. 172; Atkinson v. Printing Co., 114 N. Y. 168, 21 N. E. 178; In re North River Bank, (Sup.) 14 N. Y. Supp. 261.

And the proceeds of the checks are governed by the same principle, because the identical coins and bank notes realized from their collection constitute a part of the common mass in the receiver's hands. The mere fact that the plaintiff became a creditor of the insolvent bank through the fraud of its president, and that the bank became a trustee ex maleficio, would give him no right to preference over other creditors, unless he can trace and identify his money as a part of the common mass. But when it is shown by indubitable proofs, or is admitted, as in the present case, that the identical bank notes and coins so obtained by fraud constitute a part of the common mass of bank notes and coins in the hands of the receiver, in my judgment, the modern and better doctrine is that the depositor may take out of the common mass so much as he has put in. Lewin, Trusts, 1092, 1093.

From these considerations, it follows that the demurrer must be overruled, and it is so ordered.