STATE ex rel. ROBERTSON v. JOHNSON COUNTY BANK.

McQUEEN v. JOHNSON COUNTY BANK et al.—74 S. W. (2d) 1084.

Eastern Section. May 26, 1934.

Petition for Certiorari denied by Supreme Court, October 13, 1934.

H. H. Haynes, Sr., of Bristol, and H. A. Donnelly, of Mountain City, for petitioner, H. B. McQueen.

Cox, Taylor & Epps, of Johnson City, for receiver, D. D. Robertson.

CROWNOVER, J. The petition of H. B. McQueen was filed in this cause to recover from the receiver of the Johnson County Bank $613.80, the amount of two checks, one drawn by the Southern Railway Company for $113.80, payable in Washington, D. C., and the other drawn by Grindstaff, for $500, payable in Elizabethton, Tenn., and delivered by McQueen to said bank in payment for a draft of $620, a few hours before it closed its doors, the insolvency of the bank being known to its officers but not to McQueen, payment of which draft was refused by the correspondent bank. Petitioner contends that he is a preferred creditor and is entitled to this fund because of the fraud of the bank and because said checks were not credited to the Johnson County Bank by its correspondent bank, the Dominion National Bank of Bristol, Va., until after the former bank had closed, and were therefore not commingled with its funds and can be traced and identified.

The receiver answered and denied the allegations of said petition and filed a special plea of estoppel, that McQueen had ratified the action of the Johnson County Bank and was therefore estopped to claim a preference in the distribution of the bank's assets.

The chancellor found and decreed that the Johnson County Bank was insolvent on May 18, 1931, when McQueen purchased said

draft, and that the officers of the bank were fully advised of its state of insolvency, the superintendent of banks having just prior thereto completed an examination of the affairs of the bank, which examination resulted in its closing for business on that very day; that formal action of the board of directors was taken early next morning, ordering the bank closed, when the superintendent of banks, by his representative, took charge and notified its correspondent bank, the Dominion National Bank, of Bristol, Va., not to honor or pay any drafts; that this action was taken before the Johnson County Bank had realized on the checks given it by McQueen, or before they were paid, as well as before said checks or draft had been entered on the books of the Dominion National Bank; therefore it must be held that the receipt of McQueen's money was wrongful and the funds must be viewed as trust funds and subject to be identified and recovered; that as the bank failed before these two checks were collected or paid by the drawee banks and before they had been entered on the books of the Dominion National Bank, and when said Johnson County Bank closed, the Dominion National Bank had on deposit several thousand dollars of said Johnson County Bank's funds, which were later increased by the amount of these two checks, this was sufficient tracing of the funds to enable petitioner to recover the same before they became intermingled with the general funds of the Johnson County Bank; and that the grounds of estoppel urged by the receiver were not well taken.

The receiver excepted to said decree and appealed to this court and has assigned errors which raise the following propositions:

(1) McQueen gave the Johnson County Bank the two checks in question in payment for a draft, and thereafter the only relation between the bank and McQueen by reason of the transaction was that of debtor and creditor.

(2) The funds from the two checks were credited to the Johnson County Bank by the Dominion National Bank before the former bank closed its doors, therefore they were commingled with the bank's general funds and could not be traced and identified.

(3) McQueen ratified the bank's action by presenting the draft to the Dominion National Bank for payment and paying the Johnson County Bank a note for $10 which he had borrowed instead of undertaking to rescind the transaction, and in not trying to stop payment on the two checks, therefore he is estopped to claim a preference.

H. B. McQueen, of Johnson county, on May 18, 1931, wished to send $620 to his uncle, J. F. McQueen, who lived in Indiana, to complete the payment for a house and lot he had purchased from him. He had two checks, one drawn in his favor by the Southern Railway company, payable at Washington, D. C., for $113.80, and one drawn in his favor by one J. M. Grindstaff, on the Holston Na-

tional Bank, at Elizabethton, Tenn. He went to the Johnson County Bank to get the checks cashed in order to send a money order. The cashier of the bank advised him to buy a draft. McQueen borrowed $10 from the bank, and with the two checks and $6.20 cash purchased a draft of $620, payable to James F. McQueen, drawn on the Dominion National Bank, of Bristol, Va., and mailed same to his uncle.

The board of directors of the Johnson County Bank met at 7 o'clock next morning, May 19th, and passed a resolution declaring the bank insolvent. The state bank examiner was called by telephone and arrived at about 9 o'clock that morning and the bank was officially turned over to the superintendent of banks. At about 11 o'clock, the examiner, W. A. Dance, notified the Dominion National Bank that the Johnson County Bank was in the hands of a receiver and directed it to stop payment on all drafts.

When the bank failed to open on the morning of May 19th, McQueen wired his uncle to return the draft, and, on receipt of it, presented it for payment at the Dominion National Bank, at Bristol, Va., where payment was refused.

Later McQueen paid the Johnson County Bank the $10 he had borrowed.

The original bill of the superintendent of banks in this cause alleges that on the 12th of May, 1931, he caused his bank examiners to commence an audit of the affairs of this bank and that during the course of this examination it was discovered that the bank was insolvent.

1. It is insisted by appellee, the receiver, that the relation of debtor and creditor was created between McQueen and the Johnson County Bank by the purchase of the draft. But it has been held in the cases of Klepper v. Cox, 97 Tenn., 538, 37 S. W., 284, 34 L. R. A., 536, 56 Am. St. Rep., 823, and Bruner v. First Nat. Bank, 97 Tenn., 540, 37 S. W., 286, 34 L. R. A., 532, that where the bank was hopelessly insolvent and known by its officers to be so when the transaction took place, this constitutes fraud, hence the complainant has a right to follow and reclaim the amount of the checks in preference to other creditors. if the funds can be traced and identified. It was not a sale, as the defendant bank while insolvent issued to him its draft on the Dominion National Bank, and took his valuable paper, which it sent to the latter bank for collection, and the defendant bank ceased to do business and closed its doors before the checks were received for collection or collected, and they were later collected for the receiver; hence the transaction was a fraud on McQueen, and he had a right to recover his money if it can be identified, even though it was commingled with other funds. Akin v. Jones, 93 Tenn., 353, 27 S. W., 669. 25 L. R. A., 523. 42 Am. St. Rep., 921; Sayles v. Cox, 95 Tenn., 579, 32 S. W., 626, 32

L. R. A., 715, 49 Am. St. Rep., 940; Minton v. Stahlman, 96 Tenn., 98, 34 S. W., 222. The bank was insolvent when it received McQueen's checks and issued to him its draft on the Dominion National Bank. The transaction was had on May 18, 1931. The superintendent of banks alleged in his bill that he had the bank examined on May 12, 1931, and found it to be insolvent, and took it over on the morning of May 19, 1931. Although it was transacting business on May 18th, we think there can be no doubt that it was known to be insolvent and the transaction was a fraud on McQueen. Minton v. Stahlman, supra. ''Courts would justly be the subject of ridicule if they should deliberately shut their eyes to the sources of information which the rest of the world relies upon.'' 10 R. C. L., 861, 862, section 3.

2. It is insisted that the funds from the two checks were so commingled with the bank's general funds that they could not be traced and followed and identified, and that credit was given the Johnson County Bank by the Dominion National Bank before the failure of the former. In support of this insistence defendant relies on the testimony of Paul Cocke, of the Dominion National Bank, who testified that the Dominion National Bank received the mail between 7:30 and 8 o'clock in the morning, at which time the items were ''proven out, sorted up and listed to correspondent banks;'' afterwards he said the items were ''accepted'' between 7:30 and 8 in the morning; that the checks would be entered on the books later in the morning; that on the morning of May 19th they were entered at some time between 11:30 and 12 o'clock. It is argued that these checks were accepted for collection before 8 o'clock and the Dominion National Bank did not receive notice of the insolvency of the Johnson County Bank until 11 o'clock. The contention seems to be that their acceptance was the same thing as crediting the Johnson County Bank with the amount of the checks.

It is not contended that the Dominion National Bank became a purchaser for value of these checks, so there is nothing in the contention that they were accepted between 7:30 and 8 o'clock. Actual credit was given the Johnson County Bank at some time between 11:30 and 12 o'clock, as testified by Cocke. Credit being entered after the failure of the Johnson County Bank, the proceeds did not become mingled with the general funds of the Johnson County Bank. Klepper v. Cox, 97 Tenn., 538, 37 S. W., 284, 34 L. R. A., 536, 56 Am. St. Rep., 823; Bruner v. First Nat. Bank, 97 Tenn., 540, 37 S. W., 286, 34 L. R. A., 532.

It was held in Bruner v. First Nat. Bank, 97 Tenn., 545, 37 S. W., 286, 34 L. R. A., 532, that the proceeds of checks could be reached where they were entered to the credit of the insolvent bank after it closed, although the correspondent bank had no notice of the failure.

The checks that McQueen delivered to the bank for the draft were taken by the bank and sent to the Dominion National Bank for collection, and it had them when the defendant bank ceased to do business, and they were not collected prior to the failure, but were later collected for the receiver and superintendent of banks; they were separate items easily identified; hence there is nothing in the proposition of commingling funds.

3. The most serious propositions in this case are those of ratification and estoppel. It is insisted that McQueen ratified the transaction after he had ascertained that the defendant bank was insolvent and had ceased to do business, by trying to collect the draft by presenting it to the Dominion National Bank for payment, and by afterwards paying the $10 note to the defendant bank, and because he took no steps to stop payment of his checks that he had delivered to the bank in exchange for the draft, and therefore he is estopped to insist upon rescission. After a careful examination of the record and the authorities, we have arrived at the conclusion that these defenses are not well made.

It was held in the case of Winchester Milling Company v. Bank of Winchester, 120 Tenn., 225, 111 S. W., 248, 254, 18 L. R. A. (N. S.), 441, that where a bank, employed to collect a check on another bank, forwarded the check directly to the drawee bank, and accepted in payment of the check a draft on a third bank, which draft was in turn accepted by the owner of the check for whom the collection was being made, the acceptance of the draft by the owner was a ratification of the act by the collecting bank in taking the draft, and hence precluded him from suing the collecting bank for its conduct in sending the check directly to the drawee bank, as the draft so ratified and accepted was the product of that act.

The Supreme Court said in that case:

"What actually transpired was this: When the drafts were dishonored at Chattanooga, and returned to the American National Bank, that bank transmitted them in due course to the Bank of Winchester, and that bank on the 21st of June turned these drafts over to the complainant. The complainant accepted them without objection, and subsequently brought the present action, and made it one part of its complaint against the American National Bank that the latter had failed to present these drafts for payment 'within a reasonable time and in due course.'

"This was a ratification of the American National Bank's action in taking the drafts. It is immaterial that in the same connection in the bill the complainant joins the checks and drafts in his allegation of negligence against the American National Bank. The

two demands are inconsistent. The complainant could not have a right of action for the failure of the American National Bank to duly present the Chattanooga drafts, unless it ratified the action of the American National Bank in taking those drafts; and if it did this it would have no right of action against the bank referred to for its conduct in sending the checks directly to the drawee bank, because the drafts so ratified and accepted were the product of that act."

It will be seen that the Supreme Court in that case based its action on the fact that the milling company held the drafts and based its action upon the negligence of the collecting bank in not presenting them for payment "within a reasonable time and in due course."

In this case the action is not predicated upon the $620 draft in any sense, but, on the other hand, the petitioner's suit is based upon the fraud of the insolvent bank in taking his money when it was insolvent, and known by its officers to be insolvent.

A tender of the draft back to the insolvent bank is not a condition precedent to a recovery against that institution. 7 C. J., 621, sec. 289; Merchants' Bank v. Bank of Commerce, 24 Md., 12, 53; First National Bank of Meadville v. Fourth National Bank of City of New York, 89 N. Y., 412.

We do not think that the petitioner ratified the transaction by presenting the draft to the Dominion National Bank for payment after it was returned to him. By doing this, he was simply trying to ascertain whether the draft would be paid. The principle that underlies all the cases of ratification is that the party is bound by deliberate assent made with all the facts before him necessary to form an opinion. It is the same as making a new contract, and the same elements must enter into it—that is, the assent must be given with an understanding of the material facts necessary to an intelligent assent to its terms. It appears that as soon as petitioner found that this draft would not be paid by the Dominion National Bank, he promptly complained to the insolvent bank and claimed his money, but he was told that he would have to pay his $10 note, that it could not be offset against the draft, and that he would have to take his pro rata as an ordinary creditor. Thereupon he paid the $10 note. He was an ignorant country boy, and paid the note as he did not want to have trouble about it. We think the record clearly bears out the fact that he did not know his rights at the time, and it would be absurd to say that he knew all the facts and deliberately took this worthless draft instead of his two goods checks and intended to waive his right of rescission. This proposition is ably discussed in the case of Walker v. Walker, 5 Heisk., 425.

■ It is insisted that he is estopped because he took no steps to prevent payment of his checks. We think that this insistence is not well made, for the reason, first, he consulted Mr. Grindstaff, a director of the bank and the drawer of one of the checks, and he was told that the check had probably been paid, and was assured that the bank was all right and that he would get his money in a few days. He says he did not know what to do and he was lulled to sleep by this assurance. Second, the checks were not drawn by him and he could not have stopped payment by notifying the banks on which they were drawn (Uniform Negotiable Instruments Statute, sec. 189 [Code 1932, sec. 7513]), as the maker of the checks could have done (Pease & Dwyer v. State Nat. Bank, 114 Tenn., 693, 88 S. W., 172; 7 C. J., 701, sec. 429), except by injunction, which process would have been too slow, as they would have been paid before it could have been served on the parties.

In the case at bar it appears that as soon as he found that the draft would not be paid he complained to the insolvent bank and claimed his money which was refused. Thereupon he employed a lawyer and filed the petition in this case to collect it on the ground of fraud. This was all he could do. He merely filed the draft as the best evidence of the transaction, and in no sense brought suit on the draft. This was in effect a suit for a rescission and the draft was merely evidence of the transaction. Hence, we are of the opinion that he did not ratify the transaction and is not estopped.

It results that all the assignments of errors are overruled and the decree of the chancellor is affirmed. A decree will be entered in this court in favor of H. B. McQueen and against the superintendent of banks and receiver and the surety on his appeal bond for $613.80 and interest thereon from May 1, 1931, and a lien will be declared on the proceeds of the two checks, and the superintendent of banks and receiver will be directed to pay the same out of the funds in his hands.

Faw, P. J., and DeWitt, J., concur.